Filed 7/9/15  In re Nicole B. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re NICOLE B., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D066497 |
| Plaintiff and Respondent, | (Super. Ct. No. NJ13869) |
| v. | |
| T.B. et al., | |
| Defendants and Appellants. | |

APPEALS from a judgment of the Superior Court of San Diego County, Harry M. Elias, Judge.  Affirmed.

Christina Gabrielidis for Defendant and Appellant T.B.

Neale Bachmann Gold, under appointment by the Court of Appeal, for Defendant and Appellant Robert W.

Lelah S. Fisher, under appointment by the Court of Appeal, for Minor.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Paula J. Roach, Deputy County Counsel, for Plaintiff and Respondent.

T.B. and Robert W. (together, the parents) appeal following the termination of their parental rights to their minor daughter, Nicole B. The parents contend that the court erred by declining to apply the beneficial relationship exception to termination (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i)).[1] T.B. also contends that the court erred in denying her modification petition (§ 388) in which T.B. sought Nicole's return to her custody or in the alternative, increased visitation. Robert also contends that he was denied due process because the court relied on a biased witness for respondent San Diego County Health and Human Services Agency (the Agency) and discounted the testimony of Robert's expert witness. We affirm.

I

SUMMARY OF PRIOR OPINIONS

We provide the following summary of the facts and proceedings, which are described in detail in this court's four prior opinions in this case. (*In re Mary B.*[2] (Nov. 6, 2012, D062247) [nonpub. opn.]; *In re Mary B.* (2013) 218 Cal.App.4th 1474; *In re Mary B.* (Oct. 22, 2013, D063696) [nonpub. opn.]; *T.B. v. Superior Court* (March 14, 2014, D064843) [nonpub. opn.].)

---

[1]   Further statutory references are to the Welfare and Institutions Code.

[2]   Nicole was born at home and her birth was not registered. She was initially called Mary, but when her birth was registered in 2014, the parents stated that her name was Nicole.

Nicole was born in March 2008. Her first dependency case began because she tested positive for amphetamine at birth and T.B. admitted having used diet pills during pregnancy. That case ended in July 2009, when the juvenile court awarded Robert custody of Nicole and allowed T.B. supervised visitation.

Nicole's second case began in December 2011, when she was three years old. That case arose because Robert physically assaulted T.B. in Nicole's presence, the parents had a history of engaging in physical altercations in Nicole's presence, and the parents refused to participate in services and continued to live together, in violation of the court's orders. The court made a true finding on the petition, ordered Nicole placed in foster care and ordered reunification services for the parents.

In May 2013, Nicole began a 60-day trial visit with Robert. The trial visit ended in July because Robert had allowed Nicole to stay with T.B., who had not participated in services, and Robert had been staying in T.B.'s home with them, in violation of the court's orders. In August, Nicole was moved to her sixth placement, the concurrent home[3] of a maternal aunt and uncle (together, the aunt and uncle), where she remained for the rest of the case.

On October 30, 2013, the court terminated reunification services and set a section 366.26 hearing. By that time, Nicole was five and one-half years old and had been in the dependency system for more than four years. The parents had received more than two

---

3    The word "concurrent" is used to describe a home in which a child is placed during the reunification period and that may become a permanent home if reunification efforts fail.

and one-half years of services, yet lacked insight into the protective issues. They continued to be uncooperative, deceptive and manipulative and continued to disregard the court's orders for supervised and separate visits.

## II

## EVENTS RELEVANT TO THIS APPEAL

The instant appeal concerns events following the October 2013 hearing. In May 2014, T.B. filed her section 388 petition. The hearing on the petition and the section 366.26 hearing began in July. In July, the court granted the aunt and uncle's request for de facto parent status. In August, the court denied T.B.'s section 388 petition and terminated parental rights. By that time, Nicole was six years old. The aunt and uncle wanted to adopt her.

## III

## T.B.'S SECTION 388 PETITION

Section 388 allows the juvenile court to modify an order if a parent establishes, by a preponderance of the evidence, that changed circumstances exist or that there is new evidence, and that the proposed modification would promote the child's best interests. (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806.) On appeal, "[t]he juvenile court's judgment is presumed to be correct, and it is appellant's burden to affirmatively show error." (*In re S.C.* (2006) 138 Cal.App.4th 396, 408.) We review the denial of a section 388 petition for abuse of discretion. (*In re Jasmon O.* (1994) 8 Cal.4th 398, 415.)

4

In T.B.'s section 388 petition, she sought modification of the court's order that Nicole be placed with relatives, made on February 25, 2014, "and previous dates."[4] The petition alleged that the Agency had abused its discretion in maintaining that placement and not allowing T.B. "increased custodial time." As changed circumstances, T.B.'s petition alleged that she had "substantially complied [with]and completed her case plan"; had "gone above and beyond including, but not limited to, individual counseling, domestic abuse education classes and a personal empowerment program"; and had "successfully completed several monitored drug tests." T.B. requested Nicole's return to her care and custody, or, in the alternative, increased visitation including overnight and weekend visits and a 60-day trial visit. The petition alleged that the proposed modification would be in Nicole's best interests because she and T.B. had "a strong and loving bond"; T.B. was "ready, willing and able to provide a safe, loving home for" Nicole; and it was "in Nicole's best interest to have continued, increased contact with" T.B.

In a declaration submitted with the petition, T.B. stated that the aunt and uncle were intentionally interfering with her visitation and contact with Nicole, and that visits had been reduced from twice weekly four-hour visits to weekly three-hour visits. T.B. also declared that she had "complied with this court regarding contact with" Robert; she continued to be involved in services; she had benefitted from services; and she took

---

4    The court did not make a placement order on February 25, 2014. The previous hearing took place on October 30, 2013, the day the court terminated services and set the section 366.26 hearing. The last placement order was made on October 13, when the court ordered that Nicole be placed with a relative.

5

responsibility for her actions that had led to these proceedings. Attached as exhibits to the petition were a report from T.B.'s therapist dated October 22, 2013; reports of negative drug tests dated November 1, 2013, to February 12, 2014;[5] a February 20, 2014, certificate of completion of a 26-session, 52-hour domestic violence victims' treatment program; and two letters from the program's director. In a letter dated February 20, 2014, the director stated that he had provided T.B. with domestic violence victim's counseling since October 5, 2013. The director concluded that T.B. "has demonstrated that she has gained new skills and perspectives that should allow her to choose a relational style based on assertive communication, mutual respect, accurate empathy, and non-violence." In a letter dated May 25, 2014, the director stated that T.B. "demonstrated to me over the [six] months that I worked with her that she is not psychologically or emotionally dependent on [Robert]."

In denying the section 388 petition, the court stated that the issue was what had transpired since October 30, 2013, the date on which the court set the section 366.26 hearing, and that anything that T.B. had accomplished prior to that date did not constitute new evidence or a change in circumstance.[6] The court noted that T.B. had completed the domestic violence victims' treatment program, but stated that the court was "not . . . convinced that the standard as to true change in circumstances has been met."

---

5      In her declaration, T.B. claimed that she had tested twice a week. However, during the 14 weeks and five days between November 1, 2013, and February 12, 2014, she tested only 22 times. There were several weeks when she tested only once and there was one hiatus of 13 days between tests.

6      As mentioned above, the date of T.B.'s therapist's report was October 22, 2013.

The court "assume[d] for appellate review that that was met," and proceeded to find that T.B. had not met her burden of proving that placing Nicole with T.B. would be in Nicole's best interests. The court noted that T.B. had never had a court-authorized overnight visit with Nicole. The court characterized Nicole's desire to live with "mommy and daddy" as "somewhat significant and probably healthy for [Nicole]," but also as an indication that she had lived with the parents together during the dependency proceedings, in violation of the court's orders. The court concluded that "even were there new evidence or a change in circumstances, I cannot find and do not find that it would be in the best interest of [Nicole] to change the orders now, move her from her present placement and place her with [T.B.]."

T.B. argues on appeal that there was evidence that she had not violated the court's orders intentionally but, rather, that "her cognitive difficulties obscured her ability to accurately process information and act in accordance with her good intentions." T.B. also contends that Nicole had not been exposed to domestic violence since 2011. She further points out that in July 2013, when the last violation of a court order occurred, there was no domestic violence alleged. T.B. concludes that in view of her strong bond with Nicole and the tenuous nature of Nicole's placement with the aunt and uncle, it was in Nicole's best interests to be placed with T.B., or at least to have increased visitation.

Assuming without deciding that T.B.'s completion of the domestic violence program constitutes a change of circumstances, she has not shown that the juvenile court abused its discretion by concluding that she failed to show that the proposed modification was in Nicole's best interests. Because this case was past the reunification phase, the

7

focus was on Nicole's need for permanency and stability, and there was a rebuttable presumption that it was in her best interests to remain with the aunt and uncle, who wished to adopt her. (*In re Stephanie M*. (1994) 7 Cal.4th 295, 317.) T.B. did not rebut that presumption. The court could have reasonably concluded that placement with T.B. would have deprived Nicole of the permanency and stability that she had found during her year in the aunt and uncle's home, after five changes of placement in as many years. Increased visitation would have delayed Nicole's attainment of a permanent home in favor of a perpetuation of the chaos and confusion to which she had been exposed during her years in the dependency system. The court did not abuse its discretion by denying T.B.'s section 388 petition.

IV

ROBERT'S DUE PROCESS CLAIMS

Robert contends that he was denied due process because the court relied on the testimony of adoptions social worker Stephanie Novitski, whose section 366.26 report the court found to be biased, and because the court discounted the testimony of Robert's expert witness, psychologist Robert Suiter, who conducted a bonding study with Nicole and the parents.

A

*Novitski*

Novitski had been an adoptions social worker for seven years. She was assigned to this case toward the end of February 2014. She prepared the section 366.26 report in May and an addendum report in July. At the section 366.26 hearing, Novitski testified

8

that her reports did not include statements of other social workers who had observed Nicole interact affectionately with the parents during visits.

The court agreed with the parents that Novitski's report was "biased in the direction of adoption." The court then stated that the hearing gave "each side the ability to go underneath the report, behind the report, and bring out what are the true facts. And I think . . . like a lot of people that on cross-examination, . . . Ms. Novitski said, yeah, I didn't include that [in my report]; at times said she should have and other times didn't really respond. But I know the information, so I can then take into account what the facts and information [are] regardless of who the author is, regardless of who testified to it." The court also stated, "I'm not relying solely on the [section 366.26] report because I recognize the bias that is inherent there. It's in part . . . premised on the nature of the job that [adoption social workers] do. They're given a pretty clear direction by the time the case goes to the adoptions unit that's where they're heading unless something really occurred here." Finally, the court stated, "And Ms. Novitski is [at] sort of a disadvantage. She wasn't even the first adoptions worker on the case. She picked it up somewhat after the fact. So I recognize there's a bias there to begin with. I'm relying more on what I believe the actual testimony is before me because . . . there's hardly anyone I didn't hear from if it was pertinent on the issues of the case."

B

*Dr. Suiter*

Dr. Suiter conducted the bonding study on June 29, 2014. According to his report, the bonding study consisted of Dr. Suiter's review of documents relating to this case;

9

separate interviews of unspecified length with T.B., Robert and Nicole; a 45-minute observation of Nicole with T.B.; and a 45-minute observation of Nicole with Robert. The report stated that Nicole did not know why she was living apart from the parents, but "she very definitely wants to be with them." The report concluded that Nicole was bonded to the parents, looked "to them as a source of safety and security," would "benefit from an ongoing relationship with both parents" and would suffer detriment if the parental relationship were terminated.

At the section 366.26 hearing, Dr. Suiter testified that the bonding study lasted "just over an hour, about an hour and 40 minutes"; his interview with Nicole was "not very long[,] approximately 15 minutes"; and his observation of Nicole with T.B. might have been "a bit less" than 45 minutes. If, as stated in Dr. Suiter's report, his observation of Nicole with Robert lasted 45 minutes, then during the one-hour 40-minute bonding study, there would have been virtually no time for Dr. Suiter to have conducted interviews of T.B. and Robert. Dr. Suiter testified that his bonding studies usually included more extensive interviewing than was done in this case.

Dr. Suiter's report did not list the case documents that he had reviewed. At trial, he acknowledged that he had not read all of the reports. He testified that he had read case notes from approximately October 2013 through June 2014; the section 366.26 report; the addendum report; T.B.'s psychological evaluation; and *T.B. et al. v. Superior Court*, *supra*, D064843. Of those documents, the section 366.26 report and *T.B. v. Superior Court*, *supra*, D064843, were the only ones that Dr. Suiter read before conducting the bonding study. He testified that his bonding studies usually include his review of more

10

documents than he reviewed in this case. He also testified that he was not certain how many placements Nicole had had, but he believed that "there may have been four." In fact, as noted above, Nicole was in her sixth placement.

In his report, Dr. Suiter stated that he found the parents "largely credible." At trial, Dr. Suiter admitted that T.B. had not told him that she had been arrested for drug abuse and that Robert had not been "necessarily fully credible" concerning his history of domestic violence. When Dr. Suiter was asked whether he disagreed with statements made by this court in a previous opinion that the parents were not credible, he replied "of course not."

Dr. Suiter testified that Nicole's relationship with the parents was a positive one and that she viewed them as her parents. Dr. Suiter agreed that it was important, however, that Nicole have a stable placement, and explained that balancing her need for permanency against her bond with the parents was beyond the scope of the bonding study. Dr. Suiter testified that if the court were to terminate parental rights and Nicole never saw the parents again, she would likely suffer emotional detriment. Dr. Suiter characterized the detriment as short-term depression and anxiety, with the possibility that it would last longer, and a potential for "certain acting out type of behaviors" such as, in the home, "difficulty sleeping, disturbing dreams, possibly nightmares, some tantrum-like behavior [and] difficulty following rules," and, in school, "perhaps some tantrum-like behavior or some aggression with other students, difficulty following rules, difficulty concentrating and performing adequately." Dr. Suiter admitted that he would expect some detriment in any case where parent-child contact was terminated. Dr. Suiter

11

testified that Nicole "would very definitely be emotionally bolstered by being with her mother [as] [v]irtually any child would be."

Over the Agency's objection, the court deemed Dr. Suiter an expert witness. The court recognized that there were "limits on what [Dr. Suiter] could [accomplish] because of the time frame," but did note that he could have read more material before the bonding study than the limited material he was given. The court stated that when giving "his opinion, [Dr. Suiter] hemmed." The court ultimately concluded that there was an insufficient basis for Dr. Suiter's opinion.

C

*Analysis*

"Bias is a question of credibility to be resolved by the trier of fact." (*In re Valerie A.* (2007) 152 Cal.App.4th 987, 1012.) On appeal, "[w]e do not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts." (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.) The above summary of Novitski's and Dr. Suiter's reports, their testimony and the court's statements demonstrate that the court weighed all of the evidence before making its findings and orders. Robert availed himself of the opportunity to present evidence, testify on his own behalf, call witnesses and cross-examine Novitski and challenge her reports. He was not denied due process. (*In re Crystal J.* (1993) 12 Cal.App.4th 407, 412-413.)

12

## V

## THE BENEFICIAL RELATIONSHIP EXCEPTION

The parents do not contest the finding that Nicole is adoptable. If a dependent child is adoptable, the court must terminate parental rights at the section 366.26 hearing unless the parent proves the existence of a statutory exception. (§ 366.26, subd. (c)(1); *In re Helen W.* (2007) 150 Cal.App.4th 71, 80-81.) An exception exists if "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) A beneficial relationship is one that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) If terminating parental rights "would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome . . . ." (*Ibid.*) The existence of a beneficial relationship is determined by considering "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs . . . ." (*Id.* at p. 576.) Examining the evidence in the light most favorable to the judgment (*ibid.*), we conclude that substantial evidence supports the court's findings that the parents maintained regular visitation and contact but that the beneficial relationship exception does not apply.

At the time of the section 366.26 hearing on August 14, 2014, Nicole was six years old. She had been in the dependency system for most of her life and had been in

six different placements.  For the past year, she had been out of the parents' care and living with the aunt and uncle who wanted to adopt her.  The court noted that Nicole had been "removed at an extremely early age" and added, "I don't know for significant periods of time who's really parented this child because I can't really believe either one of the parents in terms of what occurred."  We will not second guess the court's finding that the parents were not credible.  (*In re Dakota H.*, *supra*, 132 Cal.App.4th at p. 228.)

Nicole testified by stipulation:  "I love my parents, I have fun and look forward to visiting them, I would like to live with my parents, and I want to continue to visit my parents."  Nicole had told Novitski that her second preference would be to remain with the aunt and uncle.  Novitski believed that Nicole understood the meaning of adoption.

The evidence from several witnesses made it clear that Nicole enjoyed visits with the parents, was comfortable with them, shared affection with them and called them Mom and Dad.  It was clear that Nicole loved the parents and knew that they were her parents, and that the parents loved Nicole.

Social worker Novitski observed approximately a dozen visits between T.B. and Nicole and approximately a dozen visits between Robert and Nicole.  Novitski stated that Nicole rarely replied "I love you" after the parents told her they loved her, and although Nicole hugged the parents at times, she typically did not initiate affection.  Novitski believed that the parents did not fulfill a parental role during visits and that their relationship with Nicole was that of friendly visitors.  Novitski stated that the parents bought and gave Nicole whatever she wanted and were unable to set limits, and cited the gifts that the parents showered on Nicole as the reason that she looked forward to visits.

14

According to Novitski, during visits T.B. spent little time interacting with Nicole in ways other than shopping and eating, while Robert set a budget for his shopping with Nicole, spent more time interacting with her and redirected her if she was not paying attention. Aside from one visit with Robert that Novitski had observed, Nicole did not cry when visits ended, and she did not try to extend visits. Rather, Nicole separated easily from the parents when it was time to return to the aunt and uncle's home. Nicole had not asked for more visits. When Novitski asked her how she would feel if she could never see the parents again, Nicole "said she 'would be sad.' " When Novitski asked why, Nicole "said she would miss the toys they buy for her." Novitski believed that Nicole needed the stability that she had in the aunt and uncle's home, as well as with the structure, nutritious meals, school support and emotional support she had there. The aunt and uncle tended to Nicole's physical and emotional needs. Nicole was familiar with the routine in the home and knew what to expect. She was thriving. Novitski believed that the sadness that Nicole would experience if parental rights were terminated did not outweigh the benefits of adoption. Novitski concluded: "One could argue a lesser permanent plan for [Nicole] so that she [and the parents] would be able to maintain a relationship, however, that would subject [Nicole] to approximately 12 years in foster care or the instability of future contentious court hearings and she would never be afforded the opportunity to have an environment free of the child welfare system."

The parents called as witnesses three probationary social workers who had observed visits, but had not received training on assessing parent-child bonds.

The first probationary social worker, who had supervised three three-hour visits between T.B. and Nicole, testified that Nicole looked to T.B. for assistance and that T.B. played a parental role by bringing appropriate food to visits; engaging in age-appropriate activities with Nicole; being affectionate; and helping Nicole clean up, wash her hands and zip her pants. T.B. interacted appropriately with Nicole, although T.B. asked Nicole for permission to put things away when she should have been more authoritative, and at one visit T.B. did not ask Nicole to help clean up. When T.B. failed to appear for a visit, Nicole seemed sad and disappointed, but denied that she felt that way. When visits ended, Nicole did not cry or seem sad or ask to extend the visits. There was no interaction between Nicole and T.B. that indicated a strong parent-child bond. The second probationary social worker, who observed one visit between T.B. and Nicole, testified that they spent more than an hour buying toys and then ate lunch in a restaurant. T.B. attempted to please Nicole and attend to her needs; they appeared to have a comfortable relationship; and the visit was positive. When the visit was over, Nicole was not sad, did not cry, did not indicate that she wanted the visit to continue and returned easily to the aunt and uncle's home. The third probationary social worker, who observed one visit between T.B. and Nicole, testified that Nicole did not seem distressed that T.B. was 25 or 30 minutes late and did not initiate affection with T.B. nor respond in kind when T.B. said "I love you." T.B. interacted with Nicole for the entire visit. At the end of the visit, Nicole did not cry or indicate that she wanted the visit to last longer and showed no hesitation in returning to the aunt and uncle's home.

The first probationary social worker, who had supervised two three-hour visits between Robert and Nicole, testified that Robert gave Nicole snacks, interacted with her and was attentive to her needs and responsive to her cues. He was encouraging and positive, but when a drawing project became too advanced for Nicole, she lost interest and Robert used a frustrated tone of voice. At the end of both visits, Nicole hugged Robert and he carried her to the car and buckled her into the car seat. She did not cry or ask that the visits be extended. The second probationary social worker testified that she had supervised two visits between Robert and Nicole At the first visit, which lasted about one and one-half hours, Robert brought healthful snacks and activities, engaged in age-appropriate conversation with Nicole and managed her behavior. When he warned her not to play next to the parking lot, she moved away from the cars. Nicole initiated affection with Robert twice, accepted his affection, followed his directions, asked him for help and called him Dad. At the end of the first visit, they hugged and kissed and talked about the next visit. At the second visit, Nicole ran to Robert. He allowed her to choose activities, interacted with her throughout the visit and engaged in age-appropriate conversation. Robert instructed Nicole, redirected her with simple words, praised her and spoke to her affectionately. She responded to him verbally, made affectionate comments, followed instructions and stayed on task. Robert told Nicole what to do when someone made fun of her. He instructed her how to cross the street and explained the dangers. At the end of both visits, he fastened her seat belt. Nicole did not cry or indicate that she wanted the visits to last longer. When Robert failed to appear for a third visit, Nicole

seemed anxious and said that she felt "not so good."  When Robert missed another visit, Nicole seemed disappointed.

The maternal grandfather, who had known Nicole since birth and had supervised visits until six months before the hearing, testified that Nicole and T.B. shared a strong bond, Nicole initiated affection with T.B. and T.B. acted appropriately and in a parental capacity.  When the aunt and uncle brought Nicole to the maternal grandfather's home, Nicole asked the maternal grandfather, with a stoic demeanor, whether T.B. would be coming.  Nicole "was always despondent when" T.B. left.  The maternal grandfather believed that "it would be a disaster to not continue [the] relationship" between Nicole and T.B.  The maternal grandfather had also supervised visits between Robert and Nicole and testified that "they had a very warm, caring relationship" and were affectionate with each other.  Nicole appeared upset or sad when Robert left visits.  The maternal grandfather believed that severance of Nicole's relationship with Robert would be detrimental to her.

Dr. Suiter testified that T.B. brought snacks to the bonding study, which was parental in nature, as was the fact that she allowed Nicole to choose what she wanted to do.  T.B. engaged in an age-appropriate activity with Nicole, drawing with markers on construction paper.  There was no instance that required limit setting or discipline.  Nicole told Dr. Suiter that she enjoyed being with T.B. and described T.B. favorably.  Nicole viewed T.B. as her mother.  Robert brought snacks and activities to the bonding study; was engaged, warm and nurturing with Nicole; and played a parental role.  Nicole viewed Robert as her father, referred to him as Dad or Daddy and exhibited a happy

18

demeanor with him. They had a good relationship. Nicole told Dr. Suiter that the parents gave her things she wanted. She could not recall anything negative about the parents and had only good memories of them, saying that they took good care of her and that she enjoyed being with them. This indicated that Nicole had a positive relationship with the parents, and that either she had been minimally affected by the upheaval she had experienced, or the parents had attempted to influence her. Nicole did not cry at the end of the bonding study and seemed comfortable leaving with the uncle. Dr. Suiter testified that if Nicole never saw the parents again, she would likely suffer emotional detriment, but that he would expect some detriment in any case where parent-child contact was terminated. Dr. Suiter acknowledged that Nicole needed a stable placement and that balancing her need for permanency against her bond with the parents was beyond the scope of his bonding study.

As discussed above, the court did not abuse its discretion in concluding that Dr. Suiter lacked a sufficient basis for his opinion that there was a parent-child bond between the parents and Nicole and that she would likely suffer detriment if the relationship were terminated.

In finding that the beneficial relationship exception did not apply, the court stated the following: During visits, the parents at times demonstrated some parenting skills. They had addressed the issues that led to this case, although it had taken them longer than it should have. There was no evidence that T.B. was using drugs, and the tests showed that she was clean, but her failure to test according to the Agency's criteria constituted "a demonstration of power and control." The parents were reluctant "to own up to what

19

occurred"; they had participated in services, but had not shown that they had learned from the services. The parents had coached Nicole and disobeyed orders for separate visitation, thus placing Nicole "in the position of having to tattle on them," which demonstrated a lack of concern for her emotional health, mental health and well-being. The parents' deception did not demonstrate a positive emotional attachment to Nicole. Nicole had a relationship with the parents, and viewed them as her parents, but they had put her "in a continued state of flux and uncertainty," and maintaining the relationship did not outweigh the benefit that she would derive from being in a home that she knew was permanent.

The parents rely on *In re S.B.* (2008) 164 Cal.App.4th 289, in which this court concluded that the juvenile court erred by declining to apply the beneficial relationship exception. (*Id.* at p. 301.) That case is distinguishable. In *S.B.*, the child was in her father's care until she was three years old. (*Id.* at p. 293.) When she was removed, the father "immediately recognized that his drug use was untenable." (*Id.* at p. 298.) He started services, "complied with 'every aspect' of his case plan" and placed the child's needs above his own. (*Ibid.*) The child tried to leave with the father when the visits were over. (*Id.* at p. 294.) Here, in contrast, Nicole was removed from the parents' care soon after her birth. The parents did not immediately accept responsibility for the dependency, fully comply with their reunification plans or place Nicole's needs above their own.

20

VI

CONCLUSION

In some ways, this was a close case. Nicole had a positive relationship with the parents insofar as she regarded them as her parents and wanted to live with them. Fortunately, she was not physically harmed as a result of the events that led to her dependency, and there was little evidence that those events caused her serious emotional harm. Nevertheless, Nicole had been in the dependency system for virtually all her life. During that time, the parents were offered an abundance of reunification services. They made slow and desultory progress and disregarded court orders that were designed to ensure Nicole's safety. Where, as here, substantial evidence supports two possible outcomes, we will not second guess the juvenile court's choice of one of those outcomes.

DISPOSITION

The judgment is affirmed.


AARON, J.

WE CONCUR:


HALLER, Acting P. J.


McDONALD, J.